UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

COMMUNITY REFUGEE AND
IMMIGRATION SERVICES, et al.,

    Plaintiffs,

v.

DON PETIT, REGISTRAR, OHIO
BUREAU OF MOTOR VEHICLES,
in hi official capacity,

    Defendant.

Case No. 2:18-CV-1189
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson

## OPINION AND ORDER

This matter is before the Court on the Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted filed by Defendant Charles L. Norman, Registrar ("Registrar") of the Ohio Bureau of Motor Vehicles ("BMV") (ECF No. 9), Plaintiffs' Memorandum in Opposition (ECF No. 23), and Defendant's Reply (ECF No. 24). For the reasons that follow, the Court **DENIES** Defendant's Motion.

### I.

Plaintiffs Gumaa Ismail Yahya Ibrahim and Badreldin Rahouma and organizational Plaintiff Community Refugee and Immigration Services ("CRIS") filed against the BMV Registrar a Class Action Complaint for Declaratory and Injunctive Relief "to enforce the rights of refugees who apply for driver's licenses in the State of Ohio." (Compl. ¶ 1, ECF No. 1.) Plaintiffs allege:

> Refugees are a class of non-citizens authorized to work and reside in the
> United States and entitled under Ohio law and the REAL ID Act [of 2005, Pub. L.

1

No. 109–13, 119 Stat. 302 2005, codified at 49 U.S.C. § 30301[1]] to obtain driver's licenses. However, the [BMV] has enacted discriminatory policies that deny or delay the issuance of driver's licenses to these individuals. The BMV's actions are preempted by the Supremacy Clause of the United States Constitution, which forbids states from making immigration classifications distinct from those of the federal government. Because they are unable to procure driver's licenses in a timely fashion, thus hindering their fundamental right to travel to their places of employment, transport their children and family members, and otherwise participate fully in civic life, Plaintiffs and putative class members seek injunctive and declaratory relief against these policies.

Id.

A refugee is "[a]ny person who is outside any country of such person's nationality . . . who is unable or unwilling to return to, and is unable and unwilling to avail himself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Immigration and Nationality Act of 2016, 8 U.S.C. § 1101(a)(42). Refugees apply for and are granted refugee status abroad. An approval of a refugee application authorizes United States Customs and Border Protection to admit an applicant as a refugee upon arrival. 8 C.F.R. § 207.4. The individual plaintiffs herein possess refugee status from the United States Customs and Border Protection.

Upon entry and admission into the United States, refugees presenting a credible claim of "well-founded fear of persecution" are issued a Form I-94 that serves as proof of their immigration status. Neither the paper nor the electronic I-94 refugee admission document has an expiration date or other date upon which it is no longer a valid document for proof of immigration status and employment authorization. (Compl. ¶ 19.) Some I-94s, such as those held by the individually named Plaintiffs in this action, are marked "D/S," indicating that it is

---

[1] The REAL ID Act is a portion of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108–458, 118 Stat. 3638.

valid for the "Duration of Status." (ECF No. 2-2, Ibrahim I-94 document; ECF No. 2-4, Rahouma I-94 entry document). Both the paper and electronic I-94 records are acceptable proof of lawful immigration status and employment authorization on federal forms, such as United States Citizenship and Immigration Services ("USCIS") Form I-9, and Employment Eligibility Verification, which is used to verify an employee's authorization to work lawfully in the United States.

With the REAL ID Act, Congress set standards for the issuance of state driver's licenses that federal agencies will accept for official purposes, such as accessing federal facilities and boarding federally regulated aircraft. Pub. L. No. 109-13, § 201(3), 119 Stat. 231, 313 (codified at 49 U.S.C. § 30301 note § 201(3)). The REAL ID Act provides that the Secretary of Homeland Security shall determine whether a state is meeting the requirements of the REAL ID Act based on certifications made by the state to the Secretary of Homeland Security. *Id.* § 202(a)(2). Ohio, along with at least 24 other states and the District of Columbia, has agreed to comply with the REAL ID Act, thereby ensuring that its residents may use their Ohio driver's licenses to enter federal facilities and board commercial domestic flights.

To issue a REAL ID Act-compliant driver's license to an applicant, a state must require documentary evidence that the applicant has "lawful status," as defined by the REAL ID Act. *Id.* § 202(c)(2)(B). The REAL ID Act establishes nine categories of persons who have "lawful status," as required to receive a REAL ID Act-compliant driver's license: (1) citizens or nationals of the United States; (2) aliens lawfully admitted for permanent or temporary residence in the United States; (3) aliens with conditional permanent resident status in the United States; (4) aliens who have an approved application for asylum in the United States or who entered into the United States in refugee status; (5) aliens with a valid, unexpired nonimmigrant visa or

3

nonimmigrant visa status for entry into the United States; (6) aliens with a pending application for asylum in the United States; (7) aliens with a pending or approved application for temporary protected status in the United States; (8) aliens with approved deferred action status; and (9) aliens with a pending application for adjustment of status to that of an alien lawfully admitted for permanent residence in the United States or conditional permanent resident status in the United States. *Id.* § 202(c)(2)(B), 119 Stat. 231, 313 (codified at 49 U.S.C. § 30301 note); 6 C.F.R. § 37.3 (2016).

Refugees are eligible to adjust status to lawful permanent residency after they have "been physically present in the United States for at least one year." (Compl. ¶ 20) (quoting Immigration and Nationality Act of 2016, 8 U.S.C. § 1101 *et seq.*, *Id.* §§ 1101(a)(42)(definition of refugee) § 1158 (a)(1) ("Any alien who is physically present in the United States . . . *may apply* for asylum in accordance with this section . . . ."); § 1158(a)(2)(B) ("Time limit" – explaining that some refugees are eligible to apply for adjustment to lawful permanent residency after one year of physical presence in the United States)). Once an application to adjust status is approved, the refugee's period of permanent residence is retroactively dated to the date of his or her admission to the United States as a refugee. *Id.*

To apply for adjustment of status, a refugee must file an application to register for permanent residence or to adjust status, a case type I-485. *Id.* ¶ 33. Plaintiffs maintain that once a request for permanent residence or status adjustment is filed, the applicant receives an I-797C, which is a receipt notice. (Pls' Mem. in Opp. at 18) (citing USCIS, Form I-797: Types and Functions, available at https://www.uscis.gov/i-797-info; see also USCIS, Form I-797C: Notices of Action, available at https://www.uscis.gov/forms/form-i-797c-notice-action). Once the

4

application is approved, the applicant will receive an I-797, which is an approval notice showing that the permanent residency application was approved, not just filed. *Id.*

A refugee must also submit Form I-693 completed by a USCIS-certified "civil surgeon." USCIS has the authority to designate either individual physicians or members of a specified class of physicians as "civil surgeons," provided they meet the legal requirements. Immigration Nationality Act § 232(b), 8 C.F.R. § 232.2(b), and 42 C.F.R. § 34.2(b). Plaintiffs allege that "[c]ivil surgeon fees for completion of Form I-693 are not covered by Medicaid or other health insurance, and civil surgeons charge fees ranging from approximately $350 to $1000 per person for this service, plus additional fees for required vaccinations as needed." (Compl. ¶ 21.) "Timeframes for adjudication of adjustment of status applications vary from several months to over a year." *Id.*

At issue in this case, is the BMV Registrar's policy that denies Ohio driver's licenses to individuals who hold a valid I-94, but who were admitted to the United States as refugees more than two years prior to the application for a driver's license. Defendant has stipulated that the BMV policy denies driver's licenses to refugees who submit I-94 refugee admission documents that are more than two years old as sole proof of their lawful immigration status, and grants driver's licenses to refugees who present those same documents if they are less than two years old. (Statement of Stipulated Facts, ECF No. 18 ¶¶ 8, 9.) Defendant's policy as outlined in the Deputy Registrar Manual, submitted in support of the Statement of Stipulated Facts, states that a driver's license applicant presenting an "I-94 with 'indefinite' Refugee stamp over 2 years old" must also present "an I-797 with case type I-485." (Deputy Registrar Procedure Manual, ECF No. 18-1 at 33, PageID 231.) The same policy states that a driver's license applicant presenting

5

an "I-94 with 'indefinite' Refugee stamp within 2 years old . . . does not need to present any additional legal presence documents." *Id.*

Plaintiffs Rahouma and Ibrahim are refugees who were lawfully admitted to the United States in refugee status and remain in that status today, both holding valid I-94s. Both Plaintiffs were denied Ohio driver's licenses because of the BMV policy that prohibits refugees from obtaining a driver's license if they present only a refugee I-94 admission document over two years old as proof of lawful status.

Plaintiff Ibrahim was lawfully admitted to the United States as a refugee from Sudan on October 27, 2015. (Compl., ¶ 7.) In early 2018, three Deputy Registrars in the Dayton, Ohio area denied his application for a driver's license on the ground that his I-94 was more than two years old. *Id.* Plaintiff Rahouma was lawfully admitted to the United States on January 26, 2004. *Id.* ¶ 8. In February 2018, a BMV Deputy Registrar in Cleveland, Ohio denied his application for a driver's license because his I-94 was more than two years old. *Id.*

Organizational Plaintiff CRIS is a refugee resettlement agency that resettles and serves refugees and immigrants in Central Ohio. CRIS assists refugees in many aspects of resettlement, including securing housing and basic necessities; applying for Social Security cards, public assistance, and driver's licenses; enrolling children in school; accessing health screenings; and providing cultural orientation. *Id.* ¶ 55. In 2016, CRIS's refugee constituents first began informing the organization's staff attorneys that they were being denied driver's licenses. *Id.* ¶ 59.

Specifically, CRIS clients informed attorneys with the agency that the BMV Deputy Registrars would not accept their refugee I-94 documents as proof of lawful status when the I-94 was issued over two years ago. *Id.* As a result of these driver's license denials, CRIS attorneys

6

diverted resources from the organization's other priorities, spending approximately 200 hours advocating for their clients with staff of the BMV. *Id.* at ¶¶ 60, 61. Caseworkers and other CRIS staff have also accompanied refugee clients to the BMV Deputy Registrars to advocate for their clients who were denied driver's licenses pursuant to this BMV policy. *Id.* at ¶ 63.

Defendant has moved to dismiss Plaintiffs' Complaint under Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim upon which relief can be granted. That motion is ripe for review.

## II.

In evaluating a complaint to determine whether it states a claim upon which relief can be granted, a court must construe it in favor of the plaintiff, accept the factual allegations contained in the pleading as true, and determine whether the factual allegations present any plausible claim. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (clarifying the plausibility standard articulated in *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The factual allegations of a pleading "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.

## III.

Plaintiffs claim that the Supremacy Clause and the Equal Protection Clause of the Fourteenth Amendment prohibit BMV's policies denying licenses to refugees who present an I-94 admission document issued more than two years ago.[2] Defendant moves for dismissal,

---

[2] Because of the Court's conclusion herein, it is unnecessary to address Plaintiffs' Equal Protection claim. *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936); *Burton v.*

7

arguing that Plaintiffs (A) have not stated a violation of the Supremacy Clause, and has not stated a claim for relief because (B) the "facts alleged in Plaintiffs' Complaint, if true, would demonstrate that the BMV's policies actually mandate that the deputy registrars approve Plaintiffs' applications for driver's licenses." (Def's Mot. to Dismiss at 2.)

A.  **The Supremacy Clause**

The United States Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Armstrong v. Exceptional Child Center*, Inc., 135 S. Ct. 1378, 1384 (2015) (citations omitted); *see also Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 728 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902, 904 (7th Cir. 2016) (indicating that after *Armstrong*, courts may exercise equitable power to enjoin state action that is preempted by federal immigration law). "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. U.S.*, 567 U.S. 387, 398–99 (2012) (citations omitted). "From the existence of two sovereigns follows the possibility that laws can be in conflict or at cross-purposes. The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Id.* (quoting U.S. Const., Art. VI, cl. 2). "Under this principle, Congress has the power to preempt state law." *Id.* at 399.

When federal preemption is alleged, the analysis starts with "the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was

---

*United States*, 196 U.S. 283, 295 ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.").

8

the clear and manifest purpose of Congress." *City of Columbus v. Ours Garage and Wrecker Service, Inc.*, 536 U.S. 424, 438 (2002) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). While there is a strong presumption against preemption of a state law by a federal regulation, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947), Congress may preempt a state law by enacting its own specific laws. *Arizona v. U.S.*, 567 U.S. at 399 (citing *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000)). The "[p]ower to regulate immigration is unquestionably exclusively a federal power." *De Canas v. Bica*, 424 U.S. 351, 354 (1976); *see* Art. I, Section 8, U.S. Const. ("The Congress shall have Power . . . To establish an uniform Rule of Naturalization . . . .").

Plaintiffs contend that the BMV's policy that prohibits recognition of "a Form I-94—a federally issued, unexpired lawful presence document—if it is more than two years old is an improper regulation on immigration because it is an immigration classification not authorized or contemplated by federal law." (Pls' Mem. in Opp. at 2.) Specifically,

> Plaintiffs allege that BMV policy creates a state definition of 'lawful status,' with no analogue in federal law, that requires Plaintiffs and other similarly-situated individuals to prove to the BMV's satisfaction that they are lawfully present by presenting not only their refugee I-94 document but also, if said document is over two years old, by presenting Form I-797 showing approval of their I-485 application to adjust status. Such allegations are sufficient to state a claim that the BMV's policy is preempted because it creates immigration classifications independent of and contrary to federal law.

*Id.* at 9.

Defendant moves to dismiss Plaintiffs' Complaint in its entirety, first arguing that the BMV's policy regarding documentation of immigration status does not create a new immigration category, but "merely requires documentation from applicants to prove that they have obtained the immigration status they claim." (Def's Mot. at 10.) Defendant further contends that, "[a]t no point in this litigation has the Registrar argued that the refugees lose their immigration status

9

after two years. The Registrar and BMV are simply requiring proof from refugees of their continued compliance with U.S immigration laws in order to issue them a driver's license that is compliant with the REAL ID Act." (Def's Reply at 2.) Second, Defendant also takes the position is that "[t]he Registrar and BMV are merely recognizing that there is a requirement imposed by the federal government that refugees apply for permanent status after one year of residence within the U.S. and are requiring proof of compliance with that regulation before issuing a driver's license." *Id.* at 4. Finally, Defendant maintains that Plaintiffs' challenge to the Registrar's issuance of drivers licenses within the boundaries of Ohio impinges on the Registrar's authority to issue driver's licenses and to regulate licenses under its police powers. (Def's Mot. at 11.) The Registrar's arguments are not well taken.

Contrary to Defendant's first contention, the BMV policy on refugee I-94 expiration does create a subclassification of immigration status that is preempted by federal law. The Registrar creates a new category for determining whether a refugee is lawfully present, that is independent of and has no analogue in federal law. Specifically, the policy creates a category of lawful immigration status that requires a valid I-94 that was issued more than two years ago and additional documentary evidence in the form of an I-797 approval notice. Thus, those lawfully present refugees are stripped of the status of lawfully present refugees for purposes of obtaining a REAL ID Act-compliant driver's license. Federal immigration law, however, does not strip refugees of refugee status nor render them unlawfully present in the United States if they do not apply for or receive approval of an adjustment of status.

In separating refugees into two categories, those who have I-94s that are more than two years old and those who have I-94s that are less than two years old, the BMV policy impermissibly encroaches on the federal government's exclusive authority to make immigration

10

classifications and determine immigration status. *Plyler v. Doe*, 457 U.S. 202, 225 (1982) ("The States enjoy no power with respect to the classification of aliens. . . . This power is 'committed to the political branches of the Federal government.'" (citations omitted). "Although it is 'a routine and normally legitimate part' of the business of the Federal Government to classify on the basis of alien status, . . . and to 'take into account the character of the relationship between the alien and this country,' . . . only rarely are such matters relevant to legislation by a State." *Id.* (internal citations omitted) (citing *Mathews v. Diaz*, 426 U.S. 67, 84–85 (1976); *Nyquist v. Mauclet*, 432 U.S. 1, 7, n. 8 (1977)). The extensive federal statutory and regulatory scheme governing immigration classifications leaves no room for supplemental state laws or policies that classify non-citizens. States have no authority to create immigration classifications that do not exist in federal law, nor to assess the legality of a non-citizen's presence or status in the United States separately from the federal government. As Plaintiffs correctly assert:

> Plainly stated, refugees remain refugees for immigration purposes on Day One in the United States, Day 366 (one year and one day) in the United States, Day 731 (two years and one day) in the United States, and so on. The state's attempt to declare refugees to be no longer lawfully present if their I-94 is more than two years old creates immigration classifications independent of federal law and directs state officials to act as *de facto* immigration agents and judges.

(Pls' Opp. at 6) (citing to *Arizona Dream Act Coalition v. Brewer*, 855 F.3d 957, 973-74 (9th Cir. 2017).

*Arizona Dream Act Coalition v. Brewer, supra,* is instructive. In that case, the court affirmed the district court's issuance of a permanent injunction of Arizona's policy on driver's licenses because that policy distinguished between non-citizens based on the state's "own definition of 'authorized presence,' one that neither mirrors nor borrows from the federal immigration classification scheme." 855 F.3d at 973. The court explained that "by arranging federal classifications in the way it prefers, Arizona impermissibly assumes the federal

11

prerogative of creating immigration classifications according to its own design . . . ." *Id.* at 973–74.

Similarly here, the Registrar distinguishes between non-citizens based on his own definition of "lawful status," one that neither mirrors nor borrows from the federal immigration classification. By arranging federal immigration classifications in the way he prefers, the Registrar impermissibly assumes the federal prerogative of creating immigration classifications according to his own design. In so doing, the Registrar is making a determination that the I-94 the refugee submitted is no longer proof of lawful refugee status, which is a clear violation of Congress's intent for the I-94 to remain valid for the duration of status, as noted specifically on an I-94 document.

The Court finds Defendant's second argument, that it is merely recognizing and enforcing a provision in federal law, similarly unavailing. Defendant relies upon the REAL ID Act as support for its position, asserting that the Act has a provision that requires a refugee to apply for permanent status after one year. The Registrar's reliance on the REAL ID Act to support its argument is misplaced. As set forth above, the REAL ID Act enumerates nine categories of federally-created "lawful" immigration statuses under which individuals are entitled to REAL ID Act-compliant licenses. One of those categories includes an alien who "has an approved application for asylum in the United States or has entered into the United States in refugee status." Pub. L. No. 109-13-202(c)(2)(B)(iv); 119 Stat. 313; (49 U.S.C. § 30301 codified as note); 6 C.F.R. § 37.3 (2016). Congress made no distinction in this category between refugees admitted before a certain period of time and refugees admitted more recently. The Court agrees with Plaintiffs' assessment that this statutory scheme reflects the federal government's clear intent to convey that 1) refugees do not lose their refugee status simply because they have been

in the United States for a certain period of time, and 2) there is no subclassification in federal law between refugees admitted more than two years ago and refugees admitted within the past two years.

In support of his argument to the contrary, Defendant cites to the REAL ID Act's requirement that a temporary ID card or driver's license is "valid only during the period of the applicant's authorized stay in the United States or, if there is no definite end to the period of authorized stay, a period of one year." (Mot. to Dismiss, Doc. 9 at 12) (citing Pub. L. No. 109-13, 202(c)(2)(C)(ii); 119 Stat. 313; (49 U.S.C. § 30301 codified at note); 6 C.F.R. § 37.3). However, as Plaintiffs' correctly note, this provision speaks to the length of time an individual driver's license may be valid before it must be renewed, not to the length of time a refugee remains in valid refugee status in the United States. While refugee I-94s are marked "D/S," indicating that a refugee is present for the duration of his or her status as a refugee, the federal government does not strip the refugees of their status after one year. Moreover, even if Defendant were correct that the REAL ID Act requires certain conduct of refugees, it is not the proper role for the Registrar to assess and enforce the REAL ID Act provisions independent of his role determining legal status for purposes of issuing a REAL ID Act-compliant driver's license. Otherwise, the BMV employees act as *de facto* immigration agents and judges.

Finally, Defendant misapprehends Plaintiffs' allegations as they relate to the state's police power to regulate the issuance of driver's licenses within Ohio. Plaintiffs do not challenge the state's authority to issue driver's licenses, nor its general ability to regulate licenses under its police power. Rather, Plaintiffs allege that the BMV's policy impermissibly seeks to regulate immigration status by determining that refugees presenting I-94 documents over two years old have not presented proof of valid immigration status. As Plaintiffs appropriately highlight,

13

"[t]he Supreme Court and many circuit courts have found that state and local practices enacted in areas of traditional state concern like rental ordinances, employment, and policing are still preempted by federal law where they interfere with the federal government's exclusive authority to regulate immigration status." (Pls' Mem. in Opp. at 10) (citing as examples *Arizona v. U.S.*, 567 U.S. at 403, 406-07, 409, 415 (finding that three sections of Arizona's S.B. 1070 were preempted by federal law because they infringed on Congress's exclusive right to regulate the field of alien registration, sanctions on aliens employed without work authorization, and the federal system created to allow the arrest of aliens in the United States unlawfully); *United States v. South Carolina*, 720 F.3d 518, 530 (4th Cir. 2013) (finding a state law that sought to criminalize unlawful presence was preempted because it stood as an obstacle to the execution of the federal removal system and interfered with the discretion entrusted to federal immigration officials); *Lozano v. City of Hazelton*, 724 F.3d 297, 317 (3d Cir. 2013) (finding city ordinance which barred aliens from renting housing constituted an impermissible regulation of immigration law); *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (declining to apply the presumption against preemption to a state statute regulating contracts because "the thrust [of the statute] is to impinge on an area of core federal concern"—immigration law); *Ga. Latino All. For Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1265 n.11 (11th Cir. 2012) ("[L]egislation in a field where states traditionally have power does not defeat a claim of federal preemption.")).

The presumption against preemption of state laws can also be overcome when Congress enacts its own specific laws to the contrary. For example, in *Arizona v. U.S.*, the Supreme Court struck down a provision of a state statute that criminalized unauthorized employment by immigrants. 567 U.S. 387 (2012). The Court found Congress had expressly spoken to the issue

14

of unauthorized employment when it enacted the Immigration Reform and Control Act of 1986 as a "comprehensive framework for 'combatting the employment of illegal aliens'" and thus the state's attempt to regulate the same area of unauthorized employment was preempted. *Id.* at 404 (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002)).

Likewise, in the case *sub judice*, the BMV Registrar's policy to refuse refugee I-94 documents issued over two years ago as proof of lawful presence is preempted by federal law because Congress has addressed the issue of whether refugee status expires in the comprehensive federal statutory and regulatory scheme. Section 207(c)(4) of the Immigration and Nationality Act states that the Attorney General has the exclusive right to terminate immigration status. 8 U.S.C. § 1157(c)(4). Section 209(a) of the Act provides that refugees are also eligible to reside permanently in the United States as lawful permanent residents and does not state that refugee status will be revoked if an individual decides not to pursue this application. 8 U.S.C. § 1159(a), (b). Federal immigration law simply does not require a person who has received refugee status from the United States Custom and Border Protection to, within two years, apply for an adjustment of status. Defendant's policy that refugee I-94 documents are invalid as proof of lawful status after two years, when federal law expressly states to the contrary, is an impermissible regulation of immigration status.

Based on the foregoing, the Court finds that Plaintiffs have adequately pleaded a claim for equitable and declaratory relief based on federal preemption. The Court, therefore, **DENIES** Defendant's Motion to Dismiss. (ECF No. 9.)

## B.     Individual Plaintiffs and Organizational Plaintiff

Defendant BMV Registrar contends that the "facts alleged in Plaintiffs' Complaint, if true, would demonstrate that the BMV's policies actually mandate that the deputy registrars

approve Plaintiffs' applications for driver's licenses." (Def's Mot. at 2.) That is, Defendant maintains that in addition to their I-94s, both Individual Plaintiffs presented a document, an I-797, which under BMV policy sufficed to provide evidence of lawful status and should have resulted in the issuance of a driver's license. Therefore, the Registrar concludes, it was the mistakes of BMV employees that prevented the Individual Plaintiffs from receiving their drivers' licenses, not an allegedly illegal policy. This Court disagrees.

Plaintiffs do not allege that the Individual Plaintiffs presented an I-797 to the BMV. Instead, the document each Individual Plaintiff allegedly presented to the BMV was an I-797C, which the BMV policy at issue does not dictate is an acceptable document to show additional proof of lawful presence. Thus, the BMV employees did not mistakenly fail to accept the I-797C but were actually following the BMV policy by not accepting them.

The policy at issue states that the Registrar must accept a Form I-797, which the Registrar submits is a "receipt notice." Defendant maintains, therefore, that even though the policy refers to and I-797 instead of an I-797C, the policy refers to the document as a "receipt notice" so that either an I-797 or an I-797C is acceptable. Plaintiffs, however, explain that the BMV policy is based on an inaccurate description. That is, an I-797 is not a receipt notice, but rather is an *approval notice*, which shows that the permanent residency application was approved, not just filed. (Pls' Mem. in Opp. at 18) (citing *available at https://www.uscis.gov/forms/form-i-797c-notice-action.*) Neither of the Individual Plaintiffs have an I-797 because their applications for permanent residency have not been adjudicated. Instead, both Individual Plaintiffs possess an I-797C, which shows that he has submitted an application for permanent residency. The Individual Plaintiffs submitted their I-797C to the BMV, and the documents were not accepted as sufficient to meet the policy's requirements of

submission of an I-797. These actions by BMV employees were in compliance with the Registrar's policy.

Accordingly, the Court finds that when construing the Complaint in Plaintiffs' favor, and accepting all well pleaded allegations as true, Plaintiffs have presented a plausible claim that the BMV's policy caused them harm.

## IV.

Based on the foregoing, the Court **DENIES** Defendant's Motion to Dismiss. (ECF No. 9.)

**IT IS SO ORDERED.**

6-10-2019
DATE

EDMUND A. SARGUS, JR.
CHIEF UNITED STATES DISTRICT JUDGE